AO 106A  (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### Middle District of Pennsylvania

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>One cellular device, a black Apple iPhone, belonging to<br>and possessed by Alejandro Hidalgo | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 3:26-MC- 621

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Middle_____ District of _____Pennsylvania_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846 and<br>and 841 | Conspiracy to Distribute and Possess with Intent to Distribute Cocaine - Aid<br>and Abet and Attempted Possession with Intent to Distribute Cocaine |

The application is based on these facts:

See Attached Continuation Sheet

☑ Continued on the attached sheet.

☐ Delayed notice of __30__ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Ross Homentosky, USPIS- TFO
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____TELEPHONE_____ *(specify reliable electronic means).*

Date: __6/30/26__

_____
*Judge's signature*

City and state:  Wilkes-Barre, Pennsylvania

Leo A. Latella, U.S. Magistrate Judge
_____
*Printed name and title*

| Print | Save As... | Attach | Reset |
|---|---|---|---|

## CONTINUATION SHEETS

## <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.  I have been a Task Force Officer with the United States Postal Inspection Services since July 2025.  I am currently assigned to the Philadelphia Division out of Scranton, Pennsylvania investigating violations of Title 18 and 21 of the United States Code and therefore I am also a "law enforcement officer" within the meaning of 18 U.S.C.§ 2510(7).

2.  I am employed by the Pennsylvania Office of Attorney General as a Narcotics Agent since 2023.  In addition to my assignment as United States Postal Inspection Task Force Officer I am currently assigned to the Region VIII Bureau of Narcotics Investigations, located at 680 Baltimore Drive, Wilkes-Barre, Pennsylvania 18702.  I have received training in Drug Law Enforcement from the Pennsylvania Narcotics Association, Pennsylvania State Police, United States Postal and the Pennsylvania Office of Attorney General.  The trainings have been associated with identifying illegal narcotics, drug trafficking and drug interdiction and include but are not limited to: Top Gun Undercover Drug Law Enforcement Training, Hotel/Motel and Parcel Interdiction and drug identification testing.  I have had detailed conversations with

informants, drug traffickers, drug dealers and drug users.  I have debriefed drug offenders and suspects who have cooperated in drug investigations.  Therefore, I am familiar with how drug traffickers and drug users converse about controlled substances and transactions, including the use of cryptic terms, phrases and coded language, as well as common methods of operation used by drug traffickers. Furthermore, I have written multiple search warrants and court orders to obtain restricted information. I have also assisted in the execution of multiple drug search and seizure warrants.

3. As the lead investigative Task Force Officer for this case in the Middle District of Pennsylvania, I am thoroughly familiar with the information contained in this affidavit, either through personal investigation or through discussions with other officers and agents who have conducted interviews, or who have themselves obtained information, which they in turn have reported to me.  Among other things, I have received written and oral reports from law enforcement officers in multiple jurisdictions who are participating in the investigation.

4. On multiple occasions, I have participated in searches, authorized by consent, search warrants, and other legal grounds, of residences, commercial premises, vehicles, cellular telephones, phone records, social media and other areas to find evidence of criminal activity, to include narcotics trafficking. In the course of such searches, I have reviewed and inspected documents evidencing drugs and the distribution of drugs, telephone numbers and addresses, and telephone subscription and toll records maintained for telephones used to facilitate drug trafficking, packaging and weighing equipment and materials used to prepare and package drugs for re-distribution, and electronic storage and computing devices like desk-top and lap-top computers and cellular telephones, used to communicate and store information related to drug trafficking activities. In the process of conducting searches and reviewing items seized during the searches, I have become familiar with the materials and equipment used by drug traffickers to package and weigh drugs and to communicate about drug transactions and related activities.

5. Through my training and experience, I have learned that drug traffickers often use multiple cellular telephones to communicate with

others regarding drug activity. Drug traffickers are also known to utilize web-based applications as well as social media platforms to communicate with others regarding drug activity. It is common for people trafficking drugs to have multiple cellular telephones and for one or more of those cellular telephones phones to be tracked by GPS or other means.  These phones often contain information that shows travel origins and destinations, contact information for others involved in the criminal activity and types and amounts of drugs being trafficked.  In cases such as this one, where the United States Postal System is being utilized to transport illegal controlled substances, it is common for the people sending and/or receiving the drugs to track the parcel(s).  The parcel(s) are commonly tracked utilizing a cellular phone through applications or internet browsing.

6.  I make this statement in support of an application for a search warrant to search digital evidence items, specifically one cellular telephone, an Apple iPhone, which was seized from Alejandro HIDALGO's person during his arrest on January 20, 2026.

7.  The facts in this statement are based in part on my investigation of this matter and on information provided by other law enforcement

officers. Because this is being submitted for the limited purpose of potentially identifying incriminating content relevant to the investigation, I have not included each and every fact known to me concerning this investigation.  This is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8.  Based on the facts set forth herein, there is probable cause to believe that violations of 21 U.S.C 846 Conspiracy to Distribute and Possess with Intent to Distribute Cocaine have been committed by Raul PICHARDO SANCHEZ, Romulo CEPEDA BENITEZ, Roberto MESA BENITEZ, Julianna MARTINEZ ALCANTATRA and Alejandro HIDALGO. Additionally, there is probable cause to believe that violations of 21 U.S.C. 841 Attempted Possession with Intent to Distribute Cocaine have been committed by Raul PICHARDO SANCHEZ. There is also probable cause to believe that violations of Title 21 U.S.C. 841 Possession with Intent to Distribute Cocaine, Aid and Abet have been committed by Romulo CEPEDA BENITEZ and Roberto MESA BENITEZ and violations of 21 U.S.C. 841 Distribution and Possession with Intent to Distribute Cocaine have been committed

by Alejandro HIDALGO. There is also probable cause to search the information described in Attachment A [evidence, instrumentalities, contraband, or fruits] of these crimes as further described in Attachment B.

## JURISDICTION

9. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

10. During an ongoing investigation, investigators learned of a parcel group in Luzerne County/Lackawanna County area moving cocaine through the United States Postal Service (USPS). Investigators found this group sending parcels from Puerto Rico to addresses in the above-mentioned areas where the parcels were being surveilled and picked up by people in the designated area.

11. In October 2024, investigators were able to identify two parcels; one addressed to 84 Madison Street, Wilkes-Barre, Luzerne

County, PA and another addressed to 31 West Walnut Street, Kingston, Luzerne County, PA.  The parcels were both shipped from Puerto Rico, and both contained characteristics indicating drug trafficking.  Once federal search warrants were acquired for both parcels, they were opened, and it was revealed that suspected cocaine was within both parcels.  The suspected cocaine was tested utilizing a TruNarc and gave a positive indication for cocaine.  The cocaine from each parcel was seized and replaced with sham drugs.  Controlled deliveries were executed on both parcels and during the course of one of the parcel deliveries a Hispanic male later identified as Raul PICHARDO SANCHEZ was taken into custody as he picked up the parcel intended for 84 Madison Street, Wilkes-Barre.  While on surveillance for the parcel intended for 31 West Walnut Street, Kingston, investigators observed a white Acura MDX PA registration MKY3700 (hereinafter "the Acura") operated by a Hispanic male with a Hispanic female passenger.  The Acura was seen circling the block several times, but once investigators were made aware PICHARDO SANCHEZ was taken into custody, the Acura left the area in Kingston.  The Acura was identified during future surveillance operations involving this case to be

one of the vehicles surveilling several parcels being delivered by USPS carriers. A PennDot search of the vehicle found the owner to be Julianna MARTINEZ ALCANTARA at 88 Madison St. Wilkes-Barre PA.

12.     The cocaine was subsequently sent to the Pennsylvania State Police Crime Laboratory located in Pittston Township for drug analysis.  Results have been received from the Laboratory with positive indications of cocaine in both aforementioned parcels.

13.     Pursuant to this investigation, investigators received approval from Luzerne County Court of Common Pleas Judge David W. Lupas to install a GPS monitoring device on the Acura. On March 10, 2024 at approximately 5:45 A.M. the GPS monitoring device was installed on the Acura at 88 Madison St Wilkes-Barre PA.

14.     At approximately 7:00 A.M. on March 10, 2024, investigators observed the GPS monitor traveling on Interstate 81 north toward Scranton, Lackawanna County, PA. The GPS monitor was seen exiting the highway in the Scranton area and then in the area of South Main Street, Taylor PA. The Acura was seen through the GPS monitoring device circling blocks in the area of South Main Street in Taylor.

Investigators conducting surveillance began to surveil the Acura and visually observed the Acura occupied by one Hispanic male driver. The Acura was observed moving between the area of South Main Street, Taylor PA and Sussex Street, Old Forge.

15.     Investigators contacted United States Postal Inspector Landon Siske and requested information on any parcels being sent from Puerto Rico to the area of South Main Street, Taylor and/or Sussex Street, Old Forge. Inspector Siske found two parcels coming from Puerto Rico: one going to 505 South Main Street, Taylor and the second going to 220 Sussex Street, Old Forge.

16.     The parcel going to 505 South Main Street, Taylor (hereinafter "parcel A") had a shipping label indicating the consignee for parcel A was Jose Gutierrez at 505 South Main Street, Taylor. Through law enforcement databases, it was found that no one by that name resided at the residence. Furthermore, PA OAG Agents Musto and Poray interviewed a resident at 505 South Main Street. The resident also stated no one by that name lived at the residence and the resident was not expecting that package.

17.     The second parcel going to 220 Sussex Street, Old Forge (hereinafter "parcel B") had a shipping label indicating the consignee for parcel B was Joseph Torres Lopes at 220 Sussex Street, Old Forge. Through law enforcement databases, it was found that no one by that name resided at the residence.

18.     While conducting surveillance in the area of the above addresses, investigators observed the Acura meet with a blue Nissan Sentra PA registration MMK1788 (hereinafter "the Nissan"). A PennDot search of the vehicle revealed the owner to be Juliana MARTINEZ ALCANTARA at 88 Madison Street, Wilkes-Barre. The Nissan appeared to be occupied by one Hispanic male driver. The Nissan was also observed to be circling the same blocks as the Acura.

19.     While conducting surveillance, investigators observed the Acura through GPS monitoring device parked in the area of Sussex Street where parcel B would be delivered. The Acura stayed in this area for some time. Investigators conducting surveillance then visually observed the Acura in the area and making a U-turn in the middle of the street near parcel B's location. Investigators simultaneously observed the mailman in the same area. As the Acura was driving out of

the area of parcel B's target address, investigators drove past parcel B's target address. Investigators did not observe parcel B on the porch of 220 Sussex Street, but investigators did observe a USPS carrier. Investigators stopped and asked the carrier if a package was delivered to 220 Sussex Street and he confirmed that a white package was delivered to 220 Sussex Street minutes before investigators stopped the carrier.

20.    Investigators conducting surveillance also observed a separate USPS carrier deliver parcel A in the same timeframe. Although the Acura circled the blocks several times, it ultimately left Lackawanna County and was observed through GPS monitoring device traveling on Interstate 81 in the direction of Luzerne County. At this same time, investigators conducting surveillance followed the Nissan for some time. Surveillance was lost on the vehicle on South Main Street in Old Forge and the Nissan was not seen in the area again.

21.    Investigators conducting surveillance in Luzerne County observed the Acura exiting Interstate 81 from the Blackman Street exit in Wilkes-Barre. The Acura was then followed by investigators conducting surveillance to a storage facility between Blackman Street

and Wilkes-Barre Township Boulevard, Wilkes-Barre. The Acura was observed entering a gated portion of the facility until surveillance was lost on the vehicle. After a few minutes, the Acura was seen exiting the gated portion of the facility. The Acura was followed by investigators conducting surveillance and eventually traveled on Interstate 81 North going towards Scranton. The Acura again got off at the Moosic Street exit and was again seen circling the area where parcel A had been delivered, Investigators conducting surveillance observed there were now two (2) Hispanic males in the Acura. After circling the blocks several times, investigators conducting surveillance observed the passenger side door of the Acura open and the Hispanic male passenger exited the vehicle and approach 505 South Main Street. The Hispanic male passenger took parcel A from the porch of 505 South Main Street, Taylor and returned to the passenger side of the Acura. The Acura departed the area.

22.     The Acura was observed by investigators traveling on Interstate 81 South in the direction of Wilkes-Barre. Investigators conducting surveillance were set up at the same storage facility the Acura was seen at earlier in the day. Investigators conducting

surveillance followed the Acura until it was observed entering the storage facility. The Acura was again seen entering a gated portion of the facility, but surveillance was able to observe the two Hispanic males exit the vehicle and retrieve boxes from the backseat of the Acura. The Hispanic males were observed entering an enclosed portion of the facility and moments later exiting the enclosed portion of the facility. The Hispanic males brought out boxes as they exited the enclosed portion and threw the boxes in a dumpster close by.

23.     The Hispanic males entered the Acura and began to depart the area, but prior to departing the parking lot of the storage facility, the Acura circled the parking lot. The Acura appeared to be doing their own surveillance and parking next to investigators' vehicles. The Acura ultimately went back through the gated area of the storage facility and was seen retrieving the boxes thrown in the dumpster. The Hispanic males were also observed entering the enclosed portion of the facility and exiting with other packages. The Hispanic males put the boxes and the packages in the rear of the Acura and both males entered the Acura and departed the area.

24.     Investigators conducting surveillance followed the Acura and investigators observed a box to be discarded out a window of the Acura. The box was retrieved by investigators conducting surveillance. The shipping label matched the shipping label for parcel A and although the parcel was empty there was spray foam and glue adhered to the inside of the parcel. Furthermore, the label and the remnants of the box were ripped and disheveled. Your affiant knows that spray foam is utilized by parcel groups to covertly ship narcotics through domestic shippers.

25.     Investigators conducting surveillance continued to follow the Acura as it traveled on Interstate 81 North in the direction of Scranton. The Acura was followed off the Bear Creek exit onto Route 115 going towards the Pennsylvania Turnpike. The Acura entered the PA Turnpike traveling south towards Allentown. Pennsylvania State Police were notified of investigators) location and circumstances, and the Acura was stopped by PSP Shield in the area of the PA Turnpike Northeast Extension-Kidder Township, Carbon County.

26.     PSP Shield Trooper Lydon identified both males and requested them to exit the vehicle. At this time the driver was identified through a New York State learner's permit as Romulo CEPEDA

BENITEZ and the passenger was identified by Dominican Republic identification as Roberto MESA BENITEZ. Investigators were able to confirm Benitez was the operator of the Nissan conducting surveillance on the parcels in Lackawanna County. Both males were searched and on Romulo's person was found bulk U.S. currency, a wallet and two Samsung Android cellphones and on Roberto's person was one Apple iPhone. Both males did not understand English and required a Spanish translator. SA Chris Orozco was contacted by phone and read both males their Miranda Rights. Romulo agreed to speak, and SA Orozco requested consent to search the vehicle. Romulo stated that he gives consent, but we already know there is cocaine in the vehicle. At this time a K9 was requested at your affiant's location. A short time later Corporal Anthony Dobolovsky, K9 handler, arrived on scene with K9 Molly. The K9 was walked along the Acura and gave the handler positive indicators of narcotics in the vehicle. While the K9 was being walked past the vehicle Romulo stated that there was no need for a K9 since all we had to do was open the trunk and the cocaine was there.

27.     Upon conducting a search of the vehicle, investigators located in the rear hatch compartment a pillowcase that contained a

FedEx box with no shipping label affixed that had spray foam and glued remnants of another box on it. Inside the FedEx box investigators located two cellophane wrapped kilogram quantities of suspected cocaine. Investigators observed one of the wrapped kilograms contained a tracking device secreted in the wrapping. Investigators also located a second parcel in the vehicle. The second parcel was a United States Postal parcel with a shipping label addressed to Joseph Torres Lopez 220 Sussex Street, Old Forge, PA, 18518. Inside that parcel investigators located three cellophane wrapped kilogram quantities of suspected cocaine. Additionally, Investigators observed one of the wrapped kilograms contained a tracking device secreted in the wrapping. All suspected evidence recovered from the vehicle was transported to Region VIII. SNA Musto and NA Ledger conducted a TruNarc scan on one of the suspected kilograms recovered from the FedEx box and received a positive result for cocaine HCI. SNA Musto and NA Ledger conducted a TruNarc scan on one of the suspected kilograms recovered from the United States Postal parcel and received a positive result for cocaine HCI. All suspected evidence was secured in Region VIII evidence pursuant to OAG Policy and Procedure.

28.     The cocaine was subsequently sent to the Pennsylvania State Police Crime Laboratory located in Pittston Township for drug analysis.  Results have been received from the Laboratory with positive indications of cocaine in both aforementioned parcels.

29.     Romulo and Roberto were transported back to the Region VIII office and at this time Roberto requested a lawyer, but Romulo agreed to speak to your affiant and Agent Poray. During this interview a Spanish speaker officer was present. Officer Lantigua with Hazleton Police interpreted while your affiant and Agent Poray interviewed Romulo. Officer Lantigua again explained Romulo's Miranda Rights and Romulo consented to speak. Romulo explained that he just picked up packages for another male who then picked paid him and picked them up. The male picking up the packages from Romulo was known to Romulo to be traveling from Massachusetts. Romulo also provided consent for his home address of 88 Madison Street, Wilkes-Barre along with one of the cell phones found on Romulo's person belonging to him and the storage facility investigators conducting surveillance observed the Acura with Romulo and Roberto at earlier that day.

30.     On March 13, 2025, your affiant sent Apple a preservation request to preserve all data associated with the Air Tags found in the parcels affixed to the cocaine.

31.     On March 13, 2025, your affiant and Agent Poray appeared in front of Judge Michael Dotzel and obtained a search warrant for information on the Apple Air Tags found in the parcels on March 10, 2025.  On this same date, your affiant served Apple with the search warrant through their law enforcement portal.

32.     After receiving and reviewing the contents of the iCloud account associated to the Air Tags located on March 10, 2025 affixed to the kilograms of cocaine the following was confirmed; one of the Air Tags had been paired several times to two different accounts, joshir200@icloud.com and alejandro28ha@gmail.com.  The other Air Tag had been paired to just joshir200@icloud.com.  Once investigators received the information for both accounts it was found that joshir200@icloud.com may be a fictitious account, there was no information located in iCloud with that user account.  Within the account of alejandro28ha@gmail.com the following was found; a contact number saved as 'Leidy' a second and third contact saved as 'Chul 2'

and 'chuleta Nuevo' along with Puerto Rico identification card of Alejandro HIDALGO, pictures of the same male and medical forms in the name of Alejandro HIDALGO.  There were also conversations saved on the phone between HIDALGO and phone number 929-823-4654 contact saved as 'Ivan Nuevo' explaining how to connect an Apple Air Tag to a phone.  This same phone number is saved in Julianna MARTINEZ ALCANTARA's phone as 'El Sr Romulo.'  It was confirmed through Romulo CEPEDA BENITEZ'S phone download that 929-823-4654 was in fact his phone number.

33.     Through law enforcement databases, investigators confirmed the identity of Alejandro HIDALGO (DOB: 2/28/77) as a citizen of the Dominican Republic, but currently residing in Puerto Rico with a last known address of P.O. Box 6363 Loiza St Station, San Juan Puerto Rico 00914.

34.     Investigators again reviewed the surveillance videos received from USPIS of individuals dropping off packages at the USPS locations in the originating cities and the following was noted; On October 7, 2024, the package intended for 84 Madison Street, Wilkes-Barre was dropped off in a San Juan Puerto Rico Post Office by a male

matching the description of Alejandro HIDALGO. On October 8, 2024, the package intended for 31 West Walnut Street Kingston was dropped off in a San Juan Puerto Rico Post Office by a male matching the description of Alejandro HIDALGO. On March 5, 2025, the package intended for 220 Sussex Street Old Forge was dropped off in a San Juan Puerto Rico Post Office by a male matching the description of Alejandro HIDALGO.

35.     On March 8, 2025, the package intended for 505 South Main Street Taylor was dropped off in a San Juan Puerto Rico Post Office by an unknown female.

36.     On Wednesday, November 5, 2025, Raul PICHARDO SANCHEZ, Romulo CEPEDA BENITEZ, Roberto MESA BENITEZ, Julianna MARTINEZ ALCANTARA and Alejandro HIDALGO were indicted by a Grand Jury seated in the Middle District of Pennsylvania for violations of Title 21 U.S.C. 846 Conspiracy to Distribute and Possess with Intent to Distribute Cocaine, Title 21 U.S.C. 846 Attempted Possession with Intent to Distribute Cocaine, and Title 21 U.S.C 841 Possession with Intent to Distribute Cocaine.

37.     On Thursday January 20, 2026, your affiant was notified that Alejandro HIDALGO was taken into custody in Puerto Rico by the United States Marshals based upon a Federal arrest warrant issued as the result of the indictment a Grand Jury sitting in the Middle District of Pennsylvania returned charging HIDALGO with Distribution and Possession with Intent to Distribute Cocaine in violation of Title 21 U.S.C. 841 and Conspiracy to Distribute and Possess with Intent to Distribute Cocaine in violation of Title 21 U.S.C. 846. (Doc. 1 at 3:25-CR-281).  During a search incident to arrest HIDALGO was found to be in possession of a black Apple iPhone which was located in his pants pocket.  The Apple iPhone was seized. This iPhone was retained by the United States Marshal Service as evidence. The iPhone was sent to investigators from the United States Marshal Service and was received at the Pennsylvania Attorney General's Region VIII Office, 680 Baltimore Drive Wilkes-Barre, PA 18702 by your affiant on February 3, 2026.

38.     Based on my training, experience, and detailed personal knowledge, in order to use the functions on an Apple iPhone a user must establish an iCloud account. An iCloud account is essentially one's

Apple ID linked to Apple's cloud service, iCloud. It allows one to store photos, files, notes, contacts, calendars, passwords, and device backups on Apple's secure servers, keeping them up to date across all of one's Apple devices automatically. This means that changes made on one device, like adding a new contact or taking a photo, are reflected on all devices signed in with the same iCloud account. The iPhone seized from HIDALGO at the time he was taken into custody contains a unique iCloud account associated with HIDALGO. Investigators have reason to believe that the iCloud account from a previous search warrant may be the same iCloud account associated with the seized iPhone.

39.     The records received from Apple pursuant to the March 13, 2025 search warrant reveled the alejandro28ha@gmail.com address has been utilized by iCloud as an account since August 18, 2023.

40.     The Device is currently in the lawful possession of the Pennsylvania Office of Attorney General. It came into the Pennsylvania Office of Attorney General's possession in the following way: One black Apple iPhone was seized incident to arrest of suspect Alejandro HIDALGO. When taken into custody by the United States Marshal

Service in Puerto Rico, HIDALGO had the black Apple iPhone on his person. Therefore, while the United States Postal Inspection Service might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

41.    The Device is currently in storage at 680 Baltimore Dr, Wilkes-Barre, PA 18702. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the United States Postal Inspection Service.

42.    Based on my training, experience, and detailed personal knowledge of this investigation I know drug traffickers such as Alejandro HIDALGO utilize cellular telephones to facilitate drug sales, collect payments, communicate with confederates, subordinate dealers about sources of supply or "re-ups" and additionally utilize cellular telephones in an attempt to conceal their true identity and thwart efforts of law enforcement. Drug traffickers such as Alejandro

HIDALGO also utilize cellular telephones to send and receive electronic payments and to take photographs of their proceeds, items purchased with drug proceeds and the illegally possessed drugs themselves.  In this case, targets such as Alejandro HIDALGO may utilize a cellular device to track parcels and confirm the parcels he is sending arrive at the correct destinations.  Furthermore, I am aware that not only do drug traffickers such as Alejandro HIDALGO track the whereabouts of the parcel but track the timeline of the parcel to ensure there is not significant amount of time that lapses from the time the parcel is sent until it reaches said destination.  Furthermore, I am aware that narcotics traffickers are known to utilize, possess, and carry on their multiple cellular telephones which they are known to utilize in different manners in furtherance of their drug trafficking. Furthermore, I know drug traffickers are surveillance savvy and utilize multiple cellular telephones in an effort to thwart law enforcement efforts to track their movements. Drug traffickers are known to turn off and/or possess some, all and/or none of their cellular telephones when they are engaging in certain criminal acts. The mobility of cellular telephones makes it

inherently difficult to often times know the exact location of the subjects using the cellular telephone facility.

**DEFINITIONS**

The following definitions apply to this Affidavit:

"Computer," as used herein, is defined pursuant to Title 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

"Internet Service Providers" (ISPs), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet including telephone-based dial up, broadband based access via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite-based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the

connection supports.  Many ISPs assign each subscriber an account name, a username or screen name, an "e mail address," an email mailbox, and a personal password selected by the subscriber.  By using a computer equipped with a modem, the subscriber can establish communication with an ISP over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password.  ISPs maintain records ("ISP records") pertaining to their subscribers (regardless of whether those subscribers are individuals or entities).  These records may include account application information, subscriber and billing information, account access information (often times in the form of log files), e mail communications, information concerning content uploaded and/or stored on or via the ISP's servers, and other information, which may be stored both in computer data format and in written or printed record format.

"Domain names" are common, easy to remember names associated with an Internet Protocol address.  For example, a domain name of "www.usdoj.gov" refers to the Internet Protocol address of 149.101.1.32.  Domain names are typically strings of alphanumeric

characters, with each level delimited by a period.  Each level, read backwards, from right to left, further identifies parts of an organization. Examples of first level, or top-level domains, are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and, .edu for educational organizations.  Second level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the world wide web server located at the United States Department of Justice, which is part of the United States government.

"Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet.  IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a different unique number to a computer every time it accesses the Internet.  IP addresses might also be static if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.

"Electronic Communication Service" refers to any service which provides to users thereof the ability to send or receive wire or electronic communications.  (See Title 18 U.S.C. § 2510(15)).

## BACKGROUND REGARDING COMPUTER/ELECTRONIC DEVICES AND THE INTERNET

43.    I have had training in the investigation of computer-related crimes.  Based on my training and knowledge, I know the following:

a.    Cell phones and more advanced devices known as "smart phones" and tablets / laptops function the same as computers and can run computer software and applications, create and edit files, go on the Internet, chat, text, email, and interact with others on the Internet, and store, send, and receive files, among other functions.  Cell phones and smart phones can contain SD cards and/or SIM cards that can store data such as pictures, videos, text messages, contact lists, call logs and other data.

b.    The cell phone, laptop, hard drive, and tablet's abilities to store images in digital form makes the computer itself an ideal repository for contraband, to include photographs and screenshots of pertinent communications.  The size of the electronic storage media

(commonly referred to as the hard drive) used in home computers and cell phones has grown tremendously within the last several years. These drives can store hundreds of images at very high resolution.

c.     As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.  Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files.  Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others).  In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.  A forensic examiner often can recover evidence suggesting whether a computer contains peer-to-peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded.  Such information is often maintained indefinitely until overwritten by other data.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER/PHONE SYSTEMS

44.    Searches and seizures of evidence from computer devices, cell phones, smart phones, and GPSs commonly require agents to download or copy information from the devices and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment.  This is almost always true because of the following:

a.    Computer devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, cell phones, smart phones, GPSs, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names.  This requires searching authorities to examine all the stored data to determine whether it is included in the warrant.  This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally difficult to accomplish this kind of data search on site; and

b.    Searching computer and electronic systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data.  The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files.  Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

## SEARCH METHODOLOGY TO BE EMPLOYED

45.    To search for electronic data contained in computer, phone, or electronic device hardware, computer, phone, or electronic device software, and/or memory storage devices, the examiners will make every effort to use computer forensic software to have a computer search the digital storage media. This may include the following

techniques (the following is a non-exclusive list, as other search procedures may be used):

a.    Searching for image files to locate images indicative of drug trafficking activity and individuals associated with drug trafficking activity, examining log files associated with the receipt, transmission, and viewing of such images, and examining all of the data contained in such computer hardware, computer software, and /or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

b.    Surveying various file directories and the individual files they contain;

c.    Searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

d.      Examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

e.      Searching for pertinent communications and digital media relating to conduct considered illegal relating to the possession, trafficking, and purchasing of controlled substances.

e.      Scanning storage areas;

f.      Searching for malware in order to evaluate defenses, such as viruses; and/or

g.      Performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

## ABILITY TO RETRIEVE DELETED FILES

46.   Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet.  Electronic files downloaded to a hard drive or storage device can be stored for years at little or no cost.

Even when such files have been deleted, they can be recovered months or years later using readily-available forensic tools.  When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of hard drive space devoted to these files and the files are only overwritten as they are replaced with more recently-viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on the particular user's operating system, storage capacity, and computer habits.

## CONCLUSION

47.    Based upon the information above, I respectfully submit that there is probable cause to believe that the following digital evidence item, one Apple iPhone contains evidence in violation of Title 21 U.S.C. 841 Distribution and Possession with Intent to Distribute Cocaine and Title 21 U.S.C. 846 Conspiracy to Distribute and Possess with Intent to Distribute Cocaine, and therefore, I respectfully request that the attached search warrant be issued.

## <u>ATTACHMENT A</u>

## **Property to be Searched**

1. One cellular device, an Apple iPhone, hereinafter the "Device", belonging to and possessed by HIDALGO.

## ATTACHMENT B

### Items to be searched for and seized

Evidence of violations of Titel 21 U.S.C. 841 and Title 21 U.S.C. 846, including the following:

All records and contents of data contained on the Device described in Attachment "A" related to violations of Title 21 U.S.C. 841 Distribution and Possession with Intent to Distribute Cocaine and Title 21 U.S.C. 846 Conspiracy to Distribute and Possess with Intent to Distribute Cocaine involving Alejandro HIDALGO including:

- SMS messaging, "text" messaging, telephone call history for incoming/outgoing calls, email and other similar correspondence sent and/or received over this device;

- Tracking information from any parcels seized and parcels that may have not been seized;

- lists of customers and related identifying information;

- types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

- any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

- all bank records, checks, credit card bills, account information, and other financial records.

- Photographs and/or electronic documents saved/stored in this device;

- Cell phone number attached to this device;

- Contact information stored within this device;

- Evidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the USPIS may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.